**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CHARLES BUTLER, | Case No.: 2:23-cv-00566-APG-BNW |
| Plaintiff | **Order Granting Defendant Progressive Direct Insurance Company's Motion for Summary Judgment and Denying Plaintiff Charles Butler's Motion for Rule 56(d) Relief** |
| v. | |
| PROGRESSIVE DIRECT INSURANCE COMPANY, | |
| Defendant | [ECF Nos. 28, 54] |

In 2016, Plaintiff Charles Butler was injured in a car crash caused by Terri Lynn Morrison. Eventually, through litigation, Butler was assigned Morrison's claims against her insurer Progressive Direct Insurance Company. Butler now sues Progressive individually and as assignee of Morrison's claims. Butler alleges that Progressive acted unreasonably by delaying paying Morrison's $50,000 policy limit, not pursuing settlement discussions, not effectuating a settlement, not adequately informing Morrison of Butler's settlement offer, and rejecting a settlement offer within policy limits. Butler also contends that Progressive breached its duty to defend, indemnify, and provide independent counsel for Morrison. He brings claims for breach of contract, tortious and contractual breach of the covenant of good faith and fair dealing, as well as violations of Nevada Revised Statutes (NRS) § 686A.310 (the Nevada Unfair Claims Practices Act or UCPA). He also requests equitable relief.

Progressive moves for summary judgment on all claims. First, it argues that Morrison did not cooperate with Progressive, and cooperation is a condition precedent to coverage and suing under the policy. It contends that as Morrison's assignee, Butler is thus precluded from bringing these claims. It also argues that Butler's claims fail because the complaint was poorly

pleaded. Alternatively, it asserts that the only reason it could not timely effectuate a settlement was because of Morrison's non-cooperation with settlement conditions imposed by Butler. And Progressive argues that because Morrison's non-cooperation precludes coverage, Butler is not entitled to any additional payment beyond the $15,000 that Progressive was mandated to pay under Nevada's absolute liability law,[1] which it already paid out after an arbitration with Butler.

Butler responds that as an injured, third-party assignee, Morrison's non-compliance with her policy should not impact his ability to recover her policy limit. He also contends that a genuine factual dispute over Morrison's cooperation and Progressive's bad faith exists because Progressive has continued to not pay out Morrison's full policy limit in an "attempt[] to mitigate its financial responsibility by attributing blame to a deceased individual who cannot contest these allegations." ECF No. 30 at 11. Butler also seeks discovery under Federal Rule of Civil Procedure 56(d). Progressive replies that Nevada law does not make exceptions for third-party assignees, and that its $15,000 payment does not evidence bad faith because the payment was a term of the arbitration agreement.

I previously granted Butler leave to file a supplemental brief and affidavit comporting with Rule 56(d)'s requirements, which were lacking in his original request. ECF No. 49. Butler has since submitted a supplemental Rule 56(d) motion and affidavit, and attached the deposition of Progressive's Rule 30(b)(6) witness. ECF No. 54. Progressive opposes any further relief under Rule 56(d) and urges me to grant its motion for summary judgment. ECF No. 62.

---

[1] In Nevada, an insurer must pay an injured third-party the statutory minimum coverage amount of $15,000, even if the insured responsible for the injury has failed to comply with the policy. *Torres v. Nev. Direct Ins. Co.*, 353 P.3d 1203, 1207-08 (Nev. 2015) (en banc) (interpreting NRS § 485.3091).

1    I grant Progressive summary judgment on all of Butler's claims.  Morrison did not

2  cooperate with Progressive's requests regarding her claim and case, thus failing to fulfill the

3  conditions precedent necessary to receive coverage and to sue Progressive under her policy.

4  Butler as her assignee is accordingly precluded from bringing his claims.  Moreover, no

5  reasonable jury could find that Progressive acted in bad faith in handling Morrison's claim and

6  case.  There is no genuine dispute of material fact that Progressive made timely efforts to settle at

7  Morrison's policy limit but was prevented from doing so by Butler's conditioning settlement

8  upon first receiving signed documents from Morrison, and Morrison's subsequent failure to

9  cooperate.  When Morrison became non-cooperative, this raised a genuine dispute over

10  coverage, and Progressive did not act in bad faith either by not paying out her policy limit or by

11  paying Butler $15,000 as a term of the parties' arbitration agreement.  I also deny Butler's

12  motion for relief under Rule 56(d) because neither Butler's supporting affidavit nor the transcript

13  of the deposition of Progressive's Rule 30(b)(6) witness raises material issues on Morrison's

14  non-cooperation or Progressive's handling of Morrison's claim and case that could preclude

15  Progressive's summary judgment motion.

16  **I.    BACKGROUND**

17  **A. 2016-2017**

18    In May 2016, Butler and Morrison were involved in a multi-car crash caused by

19  Morrison.[2] ECF Nos. 1-1 at 4; 1-3 at 3.  At the time of the crash, Morrison had an insurance

20  policy with Progressive covering a bodily injury maximum of $50,000 per person and $100,000

21  per accident. ECF No. 28-1 at 2.  As relevant here, part six of Morrison's policy, titled "Duties in

22  Case of an Accident or Loss," states:

23  _____

[2] Morrison rear-ended another vehicle before swerving into Butler's vehicle. ECF No. 28-6 at 11.

A person seeking coverage must:
1. cooperate with [Progressive] in any matter concerning a claim or lawsuit;
2. provide any written proof of loss [Progressive] may reasonably require;
3. allow [Progressive] to take signed and recorded statements, including sworn statements and examinations under oath . . . and answer all reasonable questions [Progressive] may ask as often as [Progressive] may reasonably require;
4. promptly call to notify [Progressive] about any claim or lawsuit and send [Progressive] any and all legal papers relating to the claim or suit;
5. attend hearings and trials as [Progressive] require[s]; . . . [and]
   . . . .
9. authorize [Progressive] to obtain medical and other records.

ECF No. 28-12 at 2-3 (emphases omitted).  In the section titled "Legal Action Against Us," the policy specifies that Progressive "may not be sued unless there is full compliance with all the terms of this policy." *Id.* at 4 (emphasis omitted).

Butler sent a demand letter dated August 24, 2017, which Progressive marked as received on September 8, 2017. ECF No. 28-7 at 2.  In this letter, Butler offered to settle his claim for Morrison's policy limit. *Id.* at 2, 12-14.  He conditioned settlement upon first receiving an affidavit from Morrison (1) attesting to whether she was performing an employment-related task at the time of the accident and (2) certifying that she had no other applicable insurance coverage. *Id.* at 2, 12-14.  Progressive sent Morrison notice of the settlement demand the same day it received the letter. ECF No. 28-6 at 5.

Four days later, a Progressive representative called Morrison and left a voicemail requesting a callback, in addition to sending her a copy of the affidavit via email and mail. ECF No. 28-4 at 4.[3]  Progressive called Morrison again a week later and left another voicemail requesting a callback. *Id.*  On September 20, Progressive called Morrison but could not leave a voicemail because her inbox was full. *Id.* at 7.  The next day, Progressive spoke with Morrison

---

[3] In its claim notes, Progressive utilizes acronyms.  One example is "NOD," which refers to Morrison. *See* ECF No. 28-4 at 3 (noting "Sent NOD an email" followed by the text of the email, which starts with "Dear Mrs. Morrison, I[']ll be your primary contact for your claim.").

over the phone, and she confirmed she received the affidavit, stating that she would "take care of it on Monday" (September 25) and requested Progressive call her on Monday to remind her. *Id.* Progressive made the reminder call to Morrison, who did not pick up, with her voicemail inbox still full. *Id.*

On September 26, Progressive was still unable to reach Morrison, and it contacted Butler's representatives to communicate that it was having difficulty obtaining the affidavit from her. *Id.* at 7-8. According to Progressive's claim notes, Butler's counsel declined to waive the affidavit requirement, but agreed to grant an extension if Progressive would present its own settlement offer. *Id.* at 8. The next day, Progressive called Morrison and left a voicemail message requesting her to complete and return the affidavit. *Id.* On September 29, Butler filed a lawsuit against Morrison for the bodily injuries he suffered in the car accident. ECF No. 1-1 at 39-43. Progressive states, and Butler does not dispute, that it spoke with Butler's representative on the same day and offered to settle Butler's claim up to the policy limit without an affidavit.[4] ECF No. 28-4 at 9.

On October 3, Progressive called Morrison and left a voicemail requesting she call back. *Id.* at 8. The same day, Progressive's received a faxed letter from Butler dated October 2 stating that Progressive had possessed Butler's demand letter since approximately August 24 and more than 30 days had passed without Progressive offering a settlement. *Id.* at 8-9. Butler's counsel repeated this on a call with Progressive later the same day, during which Progressive stated it received his demand letter on September 8, and that under Nevada Administrative Code (NAC)

---

[4] Progressive alleges that it called Butler on September 29 to make this offer, but its claim log does not have a separate entry for September 29. ECF Nos. 28 at 8; 28-4 at 8. An entry dated at 4:30 p.m. on October 3, states that Progressive was "offering our [policy limit] as per conversation w/[Butler's representative] on 9/29." *Id.* at 9.

§ 686A.670(2), it had 30 days from receipt of the demand letter to investigate and respond. *Id.* at 9. The same entry also notes that the postal stamp on Butler's demand letter showed it was sent on August 31. *Id.* That same day, Progressive offered Morrison's policy limit to settle Butler's bodily injury claim, sending a letter to Morrison confirming the offer. *Id.*; ECF No. 28-6 at 8. Progressive called Morrison later that day informing her about the lawsuit and left a message asking her to complete the affidavit. ECF No. 28-4 at 10.

On October 17, Progressive sent Butler a reminder letter of its settlement offer. ECF No. 28-2 at 2. In a letter to Progressive dated the same day, Butler claimed that he filed the suit against Morrison because Progressive "failed to accept [his] demand for policy limits in a timely manner," but that he would be willing to settle for the policy limit if Morrison signed a settlement agreement and covenant not to execute. ECF No. 28-9 at 2. The same day, Progressive received the letter and called Morrison but found her voicemail inbox still full. ECF No. 28-4 at 10-11. On October 18, Progressive called Morrison and left a voicemail requesting she call back, mentioning the lawsuit, and instructing her to discuss her case with Keating Law Group, the outside defense counsel Progressive had assigned to her case. *Id.* at 11-12.

On November 6, Progressive called Morrison and left another voicemail requesting she call Progressive back to discuss her claim, or alternatively, to call Keating Law, as "they [we]re trying to reach [her] to get [the] matter resolved." *Id.* at 12. On November 14, Progressive called Morrison but noted that her numbers were not working. *Id.* Progressive also informed Keating Law of the situation and provided them with Morrison's email address. *Id.* A week later, Progressive called Morrison but found both numbers on file nonfunctional. *Id.* The next day, Keating Law sent Morrison a letter informing her that it would be handling her case and requesting that she contact them to schedule a meeting. ECF No. 28-9 at 6. The day after that,

Progressive sent Morrison a letter informing her that "there [wa]s a question of coverage as [she] ha[d] been non-cooperative," thus violating her policy terms, and "the claim [wa]s being handled under a Reservation of Rights" where Progressive reserved its right to deny coverage for the loss and to refuse to make liability payments. ECF Nos. 28-4 at 13; 28-10 at 2-4.  On December 7, Progressive's claim notes entry stated that it had "located [the] address for [Morrison] via Skip Trace and ha[d] sent [her] letters," but that she "remain[ed] non[-]responsive" and that it had "exhausted all means." ECF No. 28-4 at 13.

**B.  2018-2019**

On January 17, 2018, Progressive sent Morrison a second reservation of rights letter, and noted that she continued to be noncooperative. *Id.* at 14-15.  The same day, Progressive also noted that Keating Law had emailed Butler asking if he would agree to a release agreement instead of a covenant not to execute, but that he had refused. *Id.*  On January 22, Progressive noted that the second reservation of rights letter was not delivered to Morrison, and that due to no tracking available for the first reservation of rights letter, it was unable to confirm whether that had been delivered. *Id.* at 15.  On January 24, Progressive completed a "cold call" during which a "door hanger" was left but no contact was made with Morrison. *Id.*  On January 25, Progressive documented that another "cold call [was] completed" and noted that Morrison had not yet contacted Keating Law. *Id.*

In an entry dated February 27, Progressive noted that on February 22, a HUB Enterprises private investigator working for Keating Law and Progressive arrived at Morrison's "believed residence" and did not encounter Morrison. *Id.* at 17-18.  The investigator left information for Progressive and Keating Law with a young boy at the residence and asked him to give the information to his mother, who the private investigator believed was Morrison. *Id.*  On February

26, the private investigator visited the residence again but did not make contact with anyone. *Id.* at 18. In the first few days of March, HUB sent Morrison messages through her purported social media page to which she did not reply. ECF No. 28-9 at 25.

On March 29, Progressive documented "emails back [and] forth" with Morrison, noting that "she has called [the attorney]," and that she told Progressive that she "intend[ed] to cooperate and want[ed] this to go away." ECF No. 28-4 at 19. On April 4, Progressive noted that Morrison had not called the lawyer at Keating Law on the lawyer's cell phone as requested. *Id.* That note included a copy of an email that Keating Law had sent to Morrison the same day asking her to call as soon as possible and warning her that she "must cooperate as part of [her] agreement with [Progressive]." *Id.* Later that day, Progressive sent a third reservation of rights letter to Morrison. *Id.* On May 15, Keating Law sent Morrison another letter advising her of the pending lawsuit, sending her the complaint, requesting her to contact them, and warning her that if she continued to be unresponsive, she might lose coverage. ECF No. 28-9 at 7.

On January 13, 2019, Keating Law sent Morrison another letter updating her on the then-pending trial date and urging her to contact their office. ECF No. 28-9 at 9. They noted that "[f]or over a year [they] ha[d] tried to communicate with [her] to gain [her] cooperation in this matter" and because she "did not cooperate and discuss the matter with [their] office, the matter ha[d] not resolved." *Id.* In February 2019, Progressive requested HUB "to locate and communicate with Ms. Morrison and have her contact the office." *Id.* at 10. HUB conducted a "cold call" to Morrison's residence but did not find her there. *Id.* at 11.

On a "to-do" claim note dated March 28, 2019, Progressive noted that it had offered its policy limits to Butler, but that he was "refusing to do a release" and that Morrison had been uncooperative. ECF No. 28-4 at 20. On April 3, it similarly noted that Progressive had made an

offer for the policy limits, but that Butler was "not willing to accept the limits" until another, related claim was settled. *Id.* at 21.  In June 2019, Kimberly Johnson of Keating Law sent Morrison another letter noting that Morrison had not responded to her emails, even though Morrison had emailed a Progressive adjuster around the same time. ECF No. 28-9 at 13. Johnson also pointed out that Morrison left voicemail messages on Johnson's office phone outside of normal work hours despite being asked to call Johnson's cell phone. *Id.*  In the same letter, Johnson informed Morrison that mediation did not resolve the case and that in preparation for trial, they planned to admit liability if Morrison did not respond with an objection. *Id.*

## C. 2020-2023

In July 2020, Progressive sent Morrison a fourth reservation of rights letter noting that it reserved the right to deny coverage because Morrison had violated her policy's terms and conditions by being unresponsive to and uncooperative with Progressive and Keating Law. ECF No. 28-6 at 11-13.  It requested that she immediately contact Keating Law and cooperate with the investigation. *Id.*  From August through December 2021, Progressive hired HUB to locate and contact Morrison, but HUB's efforts to visit and call her, including by contacting her family members as well as the Clark County Family Court, were unsuccessful. ECF No. 28-9 at 14-18. In January 2022, HUB continued to search for Morrison without success. *Id.* at 19.  Keating Law sent Morrison another letter at the last address HUB identified as Morrison's possible address urging her to contact them. *Id.* at 20.

In June 2022, Butler and Progressive agreed to submit the tort claim to binding arbitration. ECF Nos. 33-1 at 2; 33-2 at 2.  As relevant here, the parties reached an agreement that the arbitration award would not be reduced to a judgment, Progressive would pay Butler $15,000 if the arbitrator's award equaled or exceeded $15,000, and Progressive's liability in a

1    subsequent bad faith lawsuit would be limited to the arbitrator's award minus any offset if the

2    bad faith suit resolved in Butler's favor. ECF No. 33-1 at 3-4. The arbitrator awarded Butler

3    $625,000. *See* ECF Nos. 1-1 at 51; 28 at 16. The next month, Keating Law issued a check to

4    Butler's counsel for $15,000, which Keating Law described as "the undisputed policy limit

5    payment" for the personal injury lawsuit. ECF No. 28-13 at 2-4.

6          On March 7, 2023, the Nevada state court granted Butler's motion for judicial assignment

7    of Morrison's rights to pursue any claims against Progressive. ECF No. 1-1 at 55-56. Three days

8    later, Butler filed this suit in Nevada state court. *Id.* at 2. Progressive then removed this case to

9    federal court on April 14. ECF No. 1 at 1. The next day, Morrison passed away. ECF No. 30-6

10   at 2.

11   **II.    LEGAL STANDARD**

12         Summary judgment is appropriate if the movant shows "there is no genuine dispute as to

13   any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

14   56(a). A fact is material if it "might affect the outcome of the suit under the governing law."

15   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence

16   is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

17         The party seeking summary judgment bears the initial burden of informing the court of

18   the basis for its motion and identifying those portions of the record that demonstrate the absence

19   of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The

20   burden then shifts to the non-moving party to set forth specific facts demonstrating there is a

21   genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

22   Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a

23   genuine dispute of material fact that could satisfy its burden at trial."). I view the evidence and

1   reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of*

2   *Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

3         Under Nevada law, "an insurance policy should be read according to general contract

4   principles." *Zurich Am. Ins. Co. v. Ironshore Specialty Ins. Co.*, 497 P.3d 625, 630 (Nev. 2021)

5   (en banc). I "interpret an insurance policy from the perspective of one not trained in law or in

6   insurance." *Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614, 616 (Nev. 2014) (en banc)

7   (quotation omitted). "If a provision in an insurance contract is unambiguous," I "interpret and

8   enforce it according to the plain and ordinary meaning of its terms." *Powell v. Liberty Mut. Fire*

9   *Ins. Co.*, 252 P.3d 668, 672 (Nev. 2011). I interpret ambiguities in the policy against the drafter,

10   interpret clauses providing coverage "broadly so as to afford the greatest possible coverage to the

11   insured," and interpret clauses excluding coverage "narrowly against the insurer." *Id.* (quotation

12   omitted).

13   **III.    ANALYSIS**

14       **A.  Breach of Contract and Breach of Implied Covenant of Good Faith and Fair**

15           **Dealing**

16         Progressive argues that Butler's claims fail because Morrison did not comply with her

17   policy terms and full compliance is a condition precedent to receiving coverage and suing

18   Progressive under the policy. It asserts that Morrison violated the policy terms when she (1) was

19   nonresponsive to its inquiries; (2) did not provide the affidavits necessary for settlement; (3) did

20   not send Progressive other legal papers, including the requested covenant not to execute; (4) did

21   not attend hearings, proceedings, and other legal meetings; and (5) did not authorize Progressive

22   to obtain other records. It argues that, as Morrison's assignee, Butler is accordingly precluded

23   from bringing claims under the policy. Butler counters that as a non-responsible/injured, third-

1  party assignee, he is not subject to defenses relating to breach of conditions that would impact

2  Morrison, the insured.  Progressive replies that Nevada law makes no such exception for

3  assignees.

4         Under Nevada law, "to succeed on a breach of contract claim, a plaintiff must show four

5  elements: (1) formation of a valid contract; (2) performance or excuse of performance by the

6  plaintiff; (3) material breach by the defendant; and (4) damages." *Walker v. State Farm Mut.*

7  *Auto. Ins. Co.*, 259 F. Supp. 3d 1139, 1145 (D. Nev. 2017) (quotation omitted).  Contracts,

8  including insurance policies, may impose a "condition precedent—that is, an event that must

9  occur before [a party to the contract] becomes obligated to perform." *Cain v. Price*, 415 P.3d 25,

10  28-29 (Nev. 2018) (quotation omitted).  And "[w]hen an insurance policy explicitly makes

11  compliance with a term in the policy a condition precedent to coverage, the insured has the

12  burden of establishing that it complied with that term." *Las Vegas Metro. Police Dep't v. Coregis*

13  *Ins. Co.*, 256 P.3d 958, 962 (Nev. 2011) (en banc).  The insured bears the burden of establishing

14  coverage under the insurance policy for both the duty to indemnify and duty to defend. *Zurich*,

15  497 P.3d at 630.  And under Nevada law, "an assignment operates to place the assignee in the

16  shoes of the assignor, and provides the assignee with the same legal rights as the assignor had

17  before assignment." *First Fin. Bank v. Lane*, 339 P.3d 1289, 1293 (Nev. 2014) (en banc)

18  (quotation omitted); *see also CitiMortgage, Inc. v. Saticoy Bay LLC Series 3084 Bellavista Lane*,

19  No. 71606, 448 P.3d 573, 2019 WL 4390765, at *1 n.2 (Nev. 2019) ("An assignee stands in the

20  shoes of the assignor and ordinarily obtains only the rights possessed by the assignor at the time

21  of the assignment, and no more." (quotation omitted)).

22         Nevada law also implies a covenant of good faith and fair dealing in every contract.

23  *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922-23 (Nev. 1991).  A breach of

1  the implied covenant of good faith and fair dealing occurs "[w]here the terms of a contract are

2  literally complied with but one party to the contract deliberately countervenes the intention and

3  spirit of the contract." *Id*.  Such a claim is different from one for breach of contract because it

4  requires literal compliance with the contract's terms. *See Jimenez v. GEICO Gen. Ins. Co.*, 448

5  F. Supp. 3d 1108, 1113 (D. Nev. 2020); *Kennedy v. Carriage Cemetery Servs., Inc.*, 727 F. Supp.

6  2d 925, 931 (D. Nev. 2010).  "It is well established that a claim alleging breach of the implied

7  covenants of good faith and fair dealing cannot be based on the same conduct establishing a

8  separately pled breach of contract claim." *Jimenez*, 448 F. Supp 3d at 1113 (quotation omitted).

9        Morrison's policy required that for her to receive coverage, she had to fulfill certain

10  duties, including: cooperating with Progressive; allowing Progressive to take signed and

11  recorded statements and answering Progressive's reasonable questions; promptly calling to

12  notify Progressive about any claim or lawsuit and sending Progressive legal papers relating to the

13  claim or suit; attending hearings and trials as Progressive required; and authorizing Progressive

14  to obtain medical and other records.  The policy states that Progressive "may not be sued unless

15  there is full compliance with all the terms of this policy." ECF No. 28-12 at 4.

16        Even viewing the facts in the light most favorable to Butler, there is no genuine factual

17  dispute that Morrison did not comply with the policy's terms.  So Butler, as her assignee, cannot

18  sue Progressive under Morrison's policy.  Morrison was almost completely unresponsive to

19  Progressive and Keating Law's efforts to contact her and their requests for her cooperation from

20  2017 to 2022.  Progressive's records show that Morrison responded to almost none of

21  Progressive's attempts to contact her in person or through phone calls, mail, emails, or social

22  media from 2017 to 2022.  By January 2022, Keating Law sent Morrison a letter stating that they

23  had also been trying to reach her about Butler's lawsuit from the time they were first retained by

1  Progressive in October 2017, but had been unsuccessful.  The few times that Morrison responded

2  to either Progressive or Keating Law did not result in her cooperating as they requested.  There is

3  no evidence that Morrison ever sent Progressive the requested signed affidavits, the covenant not

4  to execute, or other requested legal paperwork, despite Progressive and Keating Law's numerous

5  appeals and diverse efforts to contact her for several years.  Nor does Butler provide evidence to

6  rebut Progressive's evidence showing that Morrison never attended proceedings and other legal

7  meetings necessary for her claim and suit, and never authorized Progressive to obtain any other

8  records.  Progressive's Rule 30(b)(6) witness also did not testify to any other possible instance of

9  Morrison's communication or cooperation with Progressive that was not already accounted for in

10 previous filings.  Thus, no reasonable jury could find that Morrison fully cooperated with

11 Progressive regarding her claim and fully complied with her policy terms as required to receive

12 coverage and to sue Progressive under her policy.

13        Butler argues that as a non-responsible, injured third-party assignee, he is not subject to

14 coverage defenses that Progressive has against Morrison.  But either as a third-party claimant or

15 assignee, he is precluded from bringing his contractual claims.  "Third-party claimants do not

16 have a contractual relationship with insurers" and have no standing to sue someone else's insurer

17 for breaching the contract with its insured. *See Torres v. Nev. Direct Ins. Co.*, 353 P.3d 1203,

18 1211 (Nev. 2015) (en banc) (interpreting NRS § 485.3091); *see also Gunny v. Allstate Ins. Co.*,

19 830 P.2d 1335, 1335-36 (Nev. 1992) (per curiam).  As Morrison's assignee, Butler has "the same

20 legal rights as the assignor had before the assignment" and is thus precluded from bringing

21 contractual claims under the policy due to Morrison's non-cooperation. *First Fin. Bank*, 339 P.3d

22 at 1293 (quotation omitted).

23

To the extent Butler argues that Nevada would recognize an exception to these rules for injured third-party assignees, he cites no binding authority to support his assertion. The primary case to which he cites, *Northwest Airlines, Inc. v. Professional Aircraft Line Service*, is an Eighth Circuit case interpreting the compulsory insurance doctrine under Minnesota, not Nevada, law. 776 F.3d 575, 578-80 (8th Cir. 2015). Under the compulsory insurance doctrine, where an insurance policy is "issued pursuant to, and in compliance with, compulsory insurance or financial responsibility statutes, the rule followed generally . . . is that the injured person is not subject to defenses arising out of the breach of conditions subsequent to the accident even though they would be available to the insurer as against the insured." *Id.* at 579 (simplified). The court considered only whether, under Minnesota law, the compulsory insurance doctrine allowed injured third parties to recover policy proceeds notwithstanding the insured's post-incident policy violations. *See id.* at 579-83. It did not address whether an assignee of the insured is excepted from coverage defenses the insurer would have against its insured.

The Supreme Court of Nevada reached a similar ruling in *Torres*, where it held that an insured's post-incident non-compliance with notice and cooperation clauses in a policy does not defeat the insurer's $15,000 minimum indemnity obligation to injured third parties under Nevada's compulsory minimum insurance law.[5] 353 P.3d at 1205, 1208. The *Torres* court did not address whether an insured's assignee is subject to contract defenses the insurer could assert against the insured/assignor. The opinion also did not indicate that injured third parties have additional rights to recover from the insurer apart from the statutorily imposed minimum amount following an insured's post-accident policy violation. Rather, the court interpreted absolute

---

[5] Consistent with this minimum indemnity obligation and under the terms of the parties' arbitration agreement, Progressive paid Butler $15,000 in 2023. ECF Nos. 28-13 at 2; 33-1 at 3.

1   liability statutes as "a source of indemnification . . . providing at least minimum levels of

2   financial protection to accident victims." *Torres*, 353 P.3d at 1208 (quotation omitted).

3   Consequently, under the compulsory insurance statute, injured third parties can recover the

4   minimum required liability amount of $15,000 regardless of an insured's policy violation.

5          But *Torres* does not state or suggest that an injured third party could recover the full

6   policy limits if those limits exceed the statutorily-required minimum.  Nor does *Torres* suggest

7   that Nevada would create a new exception to generally applicable assignment law to allow an

8   insured's assignee to evade defenses the insurer has against its insured.  Consequently, I predict[6]

9   that if confronted with this issue, the Supreme Court of Nevada would hold that an insured's

10  assignee is subject to the same defenses as the insurer had against its insured at the time of

11  assignment.  I therefore grant Progressive's motion as to the claim of breach of contract.

12         The claim for breach of the implied covenant of good faith and fair dealing is defective

13  for other reasons.  Butler's complaint alleges that Progressive breached its contractual duties in a

14  number of ways, including by not indemnifying Morrison, not defending her, not pursuing

15  settlement discussions, not settling, not adequately informing Morrison of Butler's settlement

16  offer, and rejecting a settlement offer within policy limits.  First, these allegations do not allege

17  literal compliance with the contractual terms. *Butch Lewis Prods., Inc.*, 808 P.2d at 922-23

18  (holding breach of the implied covenant occurs "[w]here the terms of a contract are literally

19  complied with but one party to the contract deliberately countervenes the intention and spirit of

20  the contract").  Butler also impermissibly bases his implied covenant claim on the same

21

22  ─────────────────

23  [6] "When the state's highest court has not squarely addressed an issue, [I] must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises and restatements for guidance." *All. for Prop. Rts. & Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1102 (9th Cir. 2013) (quotation omitted).

1  allegations as his breach of contract claim. *Jimenez*, 448 F. Supp 3d at 1113 ("It is well

2  established that a claim alleging breach of the implied covenants of good faith and fair dealing

3  cannot be based on the same conduct establishing a separately pled breach of contract claim.")

4  (quotation omitted).  I therefore also grant Progressive's motion as to the claim of breach of the

5  implied covenant of good faith and fair dealing.

6  **B.  Tortious Bad Faith and Breach of Fiduciary Duty**

7  Progressive similarly argues that Butler is precluded from suing Progressive for bad faith

8  because Morrison failed to fulfill conditions precedent for bringing claims under her policy.

9  Alternatively, it contends that there is no factual dispute that Progressive did not act in bad faith

10  because Morrison's noncooperation on documents Butler requested as conditions to settlement

11  was the sole reason it could not effectuate a settlement.  It also contends there is no evidence it

12  breached its fiduciary duty to Morrison and points out that it paid Butler the $15,000 minimum

13  indemnification payment it was required to pay under Nevada law.  Progressive also argues that

14  Butler's claims are too vaguely pleaded.

15  Butler again counters that as a non-responsible, injured third party assignee, he is not

16  subject to the defenses relating to the insured's breach of conditions.  He also argues that

17  Progressive's $15,000 payment to him raises a genuine dispute of material fact because not

18  paying out Morrison's full policy limit, even after the arbitrator awarded Butler $625,000,

19  undercuts Progressive's assertion that it always intended to pay out the policy limit.  Progressive

20  replies that Nevada law makes no such exception for assignees.  It also argues that the $15,000

21  payment is not evidence it acted in bad faith because it was fulfilling a term of the arbitration

22  agreement, with the amount being consistent with Nevada's minimum indemnity obligation.

23

In Nevada, a violation of the duty of good faith and fair dealing may give rise to a bad faith tort claim. *U.S. Fidelity v. Peterson*, 540 P.2d 1070, 1071 (Nev. 1975). "The law, not the insurance contract, imposes this covenant on insurers." *Allstate Ins. Co. v. Miller*, 212 P.3d 318, 324 (Nev. 2009) (en banc). As relevant here, the "breach of the fiduciary nature of the insurer-insured relationship is part of the duty of good faith and fair dealing." *Powers v. United Servs. Auto. Ass'n*, 962 P.2d 596, 603 (Nev. 1998), *opinion modified on denial of reh'g*, 979 P.2d 1286 (Nev. 1999). An insurer breaches the duty of good faith and acts in bad faith when it refuses "without proper cause to compensate its insured for a loss covered by the policy." *Peterson*, 540 P.2d at 1071. An insurer is without proper cause to deny a claim when it has an "actual or implied awareness" that no reasonable basis exists to deny the claim. *Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352, 1354 (Nev. 1986). An unreasonable delay in payment can also constitute bad faith. *Guar. Nat. Ins. Co. v. Potter*, 912 P.2d 267, 272 (Nev. 1996) ("[T]his court has addressed an insurer's breach of the implied covenant of good faith and fair dealing as the unreasonable denial or delay of payment of a valid claim.").

"Generally, a bad-faith claim is subject to summary judgment if the defendant demonstrates that there was a genuine dispute as to coverage, because if the insurer had a reasonable basis to deny coverage, the insurer is unlikely to know it was acting unreasonably." *Igartua v. Mid-Century Ins. Co.*, 262 F. Supp. 3d 1050, 1053–54 (D. Nev. 2017) (quotation omitted). An "insurer does not act in bad faith merely because it disagrees with the claimant's estimation of his injuries or delays paying out benefits until it receives relevant documents or expert opinions." *Id.* at 1053-1055 (holding the insurer acted reasonably in handling an insured's claim, despite delaying payment several years, because there was a reasonable dispute about the extent of the insured's injuries and whether those injuries were caused by the accident).

Even viewing the facts in the light most favorable to Butler, no reasonable jury could find that Progressive handled Morrison's claim in bad faith. Butler is precluded from suing Progressive based on Morrison's failure to fulfill conditions precedent to coverage. Moreover, no reasonable jury could find that Progressive acted unreasonably in not immediately offering Morrison's policy limit because it had a basis for delaying settlement until it had a chance to first investigate the claim. *Igartua*, 262 F. Supp. 3d at 1055. There is no evidence that Progressive failed to inform Morrison of settlement offers, pursue settlement discussions, negotiate potential settlements, or defend and provide counsel to Morrison. Nor is there evidence that Progressive unreasonably rejected settlement offers. Progressive received Butler's demand letter on September 8, 2017, which conditioned settlement on receiving affidavits from Morrison answering whether she was fulfilling job-related duties at the time of the accident and confirming that she had no additional coverage. Progressive sent Morrison notice of the settlement demand that day. On September 26 and 29, Progressive contacted Butler's representatives and informed them that it was having trouble acquiring the affidavit from Morrison, in response to which Butler declined to waive the affidavit requirement. On October 3, Progressive offered to settle Butler's claim at Morrison's policy limit without the affidavit requirement. And when Progressive sent Butler a reminder of its settlement offer, Butler responded that he would settle if Morrison signed a settlement agreement and covenant not to execute. Progressive called Morrison the same day it received Butler's letter, subsequently undertaking numerous efforts to contact her through January 2022, but did not obtain the requested documents or any other cooperation from Morrison. When Butler filed his suit, Progressive enlisted Keating Law to defend Morrison and HUB to locate her to obtain her cooperation.

As for not paying out the policy maximum following the initial investigation, there is also no evidence that Progressive delayed or denied payment in bad faith. In the initial period after receiving the demand letter and after it had a chance to investigate the claim, Progressive could not settle and pay out Morrison's policy limit because Butler had conditioned settlement on receiving signed documents from Morrison, including affidavits and a covenant not to execute. Later, Progressive had a reasonable basis to decline paying out the policy maximum because of the dispute in Morrison's coverage arising from her noncooperation and noncommunication. This was documented by the multiple reservation of rights letters Progressive sent to Morrison in November 2017, January 2018, April 2018, and July 2020.

There is no evidence of a single instance where Morrison materially cooperated as requested. There is also no evidence she submitted the requested documents or met with Keating Law. Such a "genuine dispute as to coverage" defeats Butler's bad faith claim as a matter of law because when there is "a reasonable basis to deny coverage, the insurer is unlikely to know it was acting unreasonably." *Igartua*, 262 F. Supp. 3d at 1053-54 (quotation omitted).

Butler argues that Progressive's $15,000 payment raises a genuine issue about whether Progressive ever intended to pay out the policy limit. But no reasonable jury could find Progressive acted in bad faith when the $15,000 payment was a term of the parties' arbitration agreement. Nothing suggests that Progressive would not have paid $50,000 had Butler agreed to waive his conditions on settlement. Thus, there is no genuine issue of material fact, and Progressive is entitled to summary judgment on this claim.

Finally, the breach of fiduciary duty claim is duplicative of the bad faith claim because "breach of the fiduciary nature of the insurer-insured relationship is part of the duty of good faith

1  and fair dealing." *Powers*, 962 P.2d at 603.  I therefore grant summary judgment as to this claim

2  as well.

### C.  Nevada Unfair Claims Practices Act (UCPA) Violations

4  After originally alleging in his complaint that Progressive violated NRS

5  §§ 686A.310(1)(a)-(o), Butler later narrowed this claim to allege only violations of subsections

6  (e) and (f). ECF Nos. 1-1 at 17; 21; 22 at 2-3.  Progressive argues that there is no genuine factual

7  dispute because Progressive timely offered to settle for policy limits within 30 days of receiving

8  Butler's demand letter, then made significant efforts to reach a settlement, which were thwarted

9  only by Morrison's non-cooperation about Butler's requested documents.  Moreover, Progressive

10  argues that because Morrison violated the terms of her policy by failing to cooperate, it is not

11  obligated to indemnify Morrison beyond the $15,000 minimum payment required under

12  Nevada's minimum indemnity obligation.  Butler does not specifically address these arguments,

13  but generally contends that as a third-party assignee he is not subject to coverage-related

14  defenses affecting the policyholder.  Alternatively, he argues that Progressive's $15,000 payment

15  raises genuine issues on whether it honored Morrison's policy.  Progressive replies that the

16  payment was a term of the arbitration agreement and was made in accordance with Nevada's

17  absolute liability law.

### a.  Section 686A.310(1)(e)

19  Under the UCPA, "an insurer is liable to its insured for any damages sustained by the

20  insured as a result of" certain unfair practices. NRS § 686A.310(2).  NRS § 686A.310(1)(e)

21  prohibits insurance companies from "[f]ailing to effectuate prompt, fair and equitable settlements

22  of claims in which liability of the insurer has become reasonably clear."  As relevant here,

23  Nevada's absolute liability law requires an insurer to pay an injured third-party the statutory

1  minimum coverage amount of $15,000, notwithstanding an insured's failure to comply with the

2  policy after injuring another person. *Torres*, 353 P.3d at 1207-08 (interpreting NRS § 485.3091).

3        Here, a reasonable jury could not find for Butler on this claim because Progressive's

4  liability beyond the $15,000 mandatory minimum payment was not reasonably clear.  Morrison's

5  cooperation with Progressive was a condition of receiving coverage under the policy.  As I noted

6  above, Morrison utterly failed to do so from September 2017 up to her death in 2023.  She was

7  almost completely nonresponsive to the numerous and varied efforts to contact her about the

8  affidavit, other legal documents, and important case developments.  Progressive sent Morrison

9  several reservations of rights letters, all warning her that it reserved the right to deny her

10 coverage due to her noncooperation.  Nevada law mandated that Progressive indemnify Morrison

11 for $15,000, and it paid Butler that amount.  As Butler has not provided any evidence that

12 Morrison cooperated as Progressive requested to meet the conditions for coverage, Progressive's

13 liability beyond the $15,000 it already paid out was not reasonably clear.  As a result, no

14 reasonable jury could find that Progressive violated § 686A.310(1)(e).  I therefore grant its

15 motion on this claim.

16       **b.  Section 686A.310(1)(f)**

17       Section 686A.310(1)(f) of the UCPA prohibits insurance companies from "[c]ompelling

18 insureds to institute litigation to recover amounts due under an insurance policy by offering

19 substantially less than the amounts ultimately recovered in actions brought by such insureds,

20 when the insureds have made claims for amounts reasonably similar to the amounts ultimately

21 recovered."  Here, there is no evidence that Progressive compelled litigation by offering

22 substantially less than what Butler claimed and ultimately recovered.  After receiving Butler's

23 demand letter on September 8, 2017, which conditioned settlement on receiving affidavits from

Morrison, Morrison was uncooperative.  Progressive communicated this difficulty to Butler on September 26.  Butler's counsel declined to waive the conditions on settlement but agreed to grant an extension if Progressive presented its own settlement offer.  Progressive asserts, without contradiction from Butler, that on September 29 it verbally offered to settle Butler's claim up to Morrison's policy limit without the affidavit and reiterated this offer by letter on October 3. Butler did not respond to this settlement offer, so Progressive sent him a reminder letter on October 17, to which he conditioned settlement on Morrison signing a settlement agreement and covenant not to execute.

Both times, Progressive offered to settle at Morrison's policy maximum of $50,000 within 30 days of receiving Butler's demand letter, an amount which was not "substantially less" than the $15,000 that Progressive paid out to Butler as part of the arbitration agreement. NRS § 686A.310(1)(f).  Butler has not provided any evidence to the contrary.  I therefore grant Progressive's motion on this claim.[7]

---

[7] The complaint sets out a separate claim for equitable relief, listing estoppel, mandamus, and declaratory relief. ECF Nos. 1-1 at 18-19; 22 at 3.  However, Butler does not identify a viable independent claim for any of these remedies.  Declaratory relief is an equitable remedy that is not an independent cause of action. *See WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1197 (D. Nev. 2010).  Similarly, under Nevada law, writs of mandamus are remedies, not causes of action. *See, e.g.*, *State v. Eighth Jud. Dist. Ct.*, 42 P.3d 233, 237 (Nev. 2002) (en banc) (stating writ relief is an "extraordinary remedy").  Because I have granted summary judgment in Progressive's favor on all of Butler's claims, there is no basis upon which to grant declaratory or writ relief.  Similarly, equitable estoppel is inapplicable here because it is not an independent claim for recovery. *See Idaho Res., Inc. v. Freeport–McMoran Gold Co.*, 874 P.2d 742, 743 (Nev. 1994).  To the extent the complaint meant to refer to promissory estoppel, that claim also fails because no reasonable jury could find that Progressive made any representations about coverage or indemnification without the condition precedent of Morrison's cooperation that was "[]sufficient to induce reliance or establish a promise." *Torres*, 353 P.3d at 1209-10 (stating that the "promise giving rise to a cause of action for promissory estoppel must be clear and definite, unambiguous as to essential terms, and the promise must be made in a contractual sense" (quotation omitted)).

### D.  Rule 56(d) Motion

Butler moves for Rule 56(d) relief.  He argues that the deposition of Progressive's Rule 30(b)(6) witness, Stefani Aliberti, revealed several factual issues on whether Morrison cooperated and if Progressive acted reasonably in handling Morrison's claim and case.  He asserts that Progressive told Morrison she did not have to respond if she did not have additional insurance.  He also states that Progressive offered Morrison's policy limit only after Butler filed suit against Morrison, despite having the same information since it received his demand letter nearly a month before.  Additionally, Butler takes issue with Progressive admitting it has still not paid the policy limit despite Butler no longer conditioning settlement upon Morrison signing documents.  And he argues that the fact that his own representative discovered Morrison's death and pre-death whereabouts raises questions about whether Progressive acted reasonably in locating and communicating with Morrison to obtain her cooperation.

Progressive counters that the deposition has not provided any new evidence "that Morrison cooperated in any way with Progressive as required under her policy," nor any evidence against "its goo[d] faith efforts to resolve Butler's claims," including trying to contact her. ECF No. 62 at 3.  It argues that its letters to Morrison did not tell her that she did not have to communicate with Progressive if she did not have other insurance, but rather emphasized the opposite.  It also argues that it made its offer for settlement within 30 days of receiving Butler's settlement letter pursuant to NRS § 686A.310, and that it had no obligation to initiate or effectuate a settlement prior to receiving a formal demand letter.

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or

24

1  to take discovery; or (3) issue any other appropriate order."  The party moving for a continuance

2  must specifically identify facts "likely to be discovered" through further discovery beyond mere

3  speculation. *S.E.C. v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018) (quotation omitted).  I also

4  consider: (1) "whether the movant had sufficient opportunity to conduct discovery," (2) "whether

5  the movant was diligent," (3) "whether the information sought is based on mere speculation,"

6  and (4) "whether allowing additional discovery would preclude summary judgment." *Martinez v.*

7  *Columbia Sportswear USA Corp.*, 553 F. App'x 760, 761 (9th Cir. 2014) (citing published Ninth

8  Circuit cases for each factor).

9        Butler has not satisfied Rule 56(d).  Nothing in the affidavit or the Aliberti deposition

10  shows any facts exist relating to Morrison's cooperation or Progressive's bad faith that could

11  preclude summary judgment in Progressive's favor.  Butler does not point to evidence of

12  Morrison's communication or cooperation with Progressive that WAS unaccounted for by

13  existing filings.  Nor did he reveal any potential discrepancies in Progressive's documentation of

14  Morrison's communications and instances of cooperation.

15        Instead, Butler argues that Progressive told Morrison no response was necessary if she

16  did not have additional insurance and that Aliberti confirmed that is what Progressive told

17  Morrison.  The letter Butler refers to is a September 8, 2017 letter that advised Morrison that if

18  she had other potentially applicable insurance, she should immediately provide the name of the

19  insurer and her policy number to Progressive. ECF No. 28-6 at 6.  The letter then stated that if

20  Morrison did not respond "concerning such policies," Progressive would "assume that no such

21  [additional] policies exist." *Id.*  At her deposition, Aliberti confirmed that is what the letter

22  stated. ECF No. 62-1 at 5.  This does not raise a genuine dispute, however, because Progressive

23  then followed up to explicitly request Morrison's response, sending her another letter instructing

her to sign and return the affidavits, followed by multiple other letters and voicemails urging her to cooperate.

Butler also contends that Progressive acted unreasonably by not requesting in writing an extension of time to obtain the signed documents from Morrison and respond to Butler's demand before the 30-day response deadline set by NAC § 686A.670. But Aliberti confirmed that Progressive called Butler's counsel's office to communicate the difficulties in obtaining the affidavits and to request an extension. ECF Nos. 28-4 at 8; 54-1 at 32-33. Butler does not cite to any authority that states a verbal request for an extension is unreasonable.

Butler next argues that a reasonable jury could find that Progressive acted unreasonably by waiting until Butler filed suit against Morrison on October 3, 2017 before offering Morrison's policy limit. He contends that this was unreasonable because Aliberti confirmed that Progressive had the same information since it first received his demand letter on September 8, so there is no justification for the delay in offering the policy limit. ECF No. 54-1 at 55. But as I discussed above, Progressive timely offered the policy limit within 30 days of receiving the demand letter per the statutory deadline, and it was waiting for the signed documents from Morrison to comply with Butler's conditions on settlement. *See id.* Even if Progressive should have offered the policy limits sooner, Butler does not argue or provide evidence that he would have accepted a pre-demand or pre-suit settlement offer without imposing the conditions of signed documents from Morrison, or that Morrison would have cooperated with Progressive during the pre-demand period. *See Jimenez*, 730 F. Supp. 3d at 1095-96. To the contrary, when Progressive asked if Butler would waive those requirements, he refused, did not accept the policy limit offer without Morrison's affidavits, and subsequently again conditioned settlement on Morrison signing other documents.

And while Butler takes issue with Progressive admitting it has still not paid the policy limit despite him no longer conditioning settlement on Morrison signing documents, this does not raise a triable issue. As I previously noted, Morrison's non-cooperation raised a genuine dispute over coverage that defeats a bad faith claim on this basis.

Finally, the fact that Butler's own representative discovered Morrison's death and purported pre-death address does not raise material questions about whether Progressive acted reasonably in locating and communicating with Morrison to obtain her cooperation. Morrison passed away in March 2023. Progressive's records of its numerous and varied efforts to contact her from 2017 to 2022 are well-documented and uncontradicted by other evidence. That Progressive did not discover her death or her pre-death address sooner than Butler is irrelevant for the purposes of this motion. Butler's discovery of her death does not raise a genuine dispute about whether Progressive acted reasonably in handling Morrison's claim and case when Butler first made the policy limit demand and Progressive was acting under the statutory deadline. Nor does it impact the analysis of its efforts during the period following the statutory deadline but before Morrison's consistent non-cooperation created a genuine dispute about coverage. Thus, because Butler has not met his burden under Rule 56(d), I deny Butler's motion for denial or deferral of Progressive's motion for summary judgment.

### IV.    CONCLUSION

**I THEREFORE ORDER** that defendant Progressive Direct Insurance Company's motion for summary judgment **(ECF No. 28) is GRANTED**.

I FURTHER ORDER that Plaintiff Charles Butler's Motion for Rule 56(d) continuance **(ECF No. 54) is DENIED**.

The clerk of court is instructed to enter judgment in favor of Progressive and against plaintiff Charles Butler and to close this case.

DATED this 24th day of March, 2025.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE